Council, you may proceed. May it please the Court, Lee Marshall on behalf of Bluetooth SIG. The question presented here is whether an association of thousands of companies promoting a technology standard qualifies as a tax-exempt business league under Section 501c6. Bluetooth is not a product. It is a standard for wireless personal area networking. Does Bluetooth – Excuse me? Does it perform services? Collect a fee for service based on what they do. No, Your Honor, we do not believe it does. What Bluetooth does is three principal activities – well, four, actually. Developing the standard, promoting the standard through marketing, ensuring the integrity of the standard through qualification and trademark programs. The qualification part of it, where they make an inspection, they do some testing, and determine whether it meets the standard, right? And for that – and then they affix a seal that it's been inspected, and then sales are made based on the representation that the inspection has been made and the quality meets certain standards. Right, and all of those – This is millions of dollars, right? Well, Your Honor, there are – in the low millions of dollars in terms of – Well, low millions of dollars are millions of dollars, right? That's correct, Your Honor. And you're saying that's not income? No, we're not saying it's not revenue. We're saying that this is a not-for-profit business league and that these activities are necessary to protect the integrity of the standard, which is the activity that benefits the industry as a whole. Now – It's very different than plywood, right? Well, Your Honor, I don't think so, because in plywood there was a trademark at issue. It was the DEPA trademark, and I've studied that case. I have no idea what DEPA stands for, but it was the DEPA grade trademark for plywood, and there was a certification process to ensure that only plywood that met that grade was allowed to use the DEPA trademark. It was designed to protect the integrity of the standard. Without a trademark such as Bluetooth, consumers aren't going to know that one product will interoperate or communicate with another product. They aren't going to know that this product actually meets the standard. What is the industry here? What is the industry here? Did you say that it was the Bluetooth industry? I have a hard time following that. Our position, Your Honor, is that these activities actually promote multiple industries, for the most part all in the electronics area. That doesn't help you, does it, in terms of qualifying as a league? Yes, it does. But the plywood industry is tangible. These are manufacturers of the same product. But that's not what we have here, is it? No, Your Honor, we do have that here. We have, for example, the cellular phone industry, which the association improves the business conditions of the cellular phone industry so that one company can concentrate on their core services, which might be the cell phone, and another company can concentrate on their core services, which might be the headset. And that interoperability allows consumers to basically pick which product they want to buy from which manufacturer. It improves consumer choice. And there are also other industries where having this common language or this standard that allows devices from two different manufacturers to talk to each other, there are also other industries where it improves the business conditions. Personal computer industry where Bluetooth is the language that would allow, for example, a laptop to talk wirelessly to a printer and send a print job to that printer. So all of these types of electronic industries where there is a need for a standard or common language for two different devices to talk to each other, it improves the business conditions in those industries. Now, if I got this right, that what we're talking about is the standard for basically short-term communications between electronic devices. So it includes cell phones and computers talking to printers. It includes cameras that talk to printers, just the whole range of things. Is that right? That's right. It's a wireless communication language within 10 meters. Is there 10 meters? Yes. Is there a competing protocol? Well, Your Honor, I'm not aware of one. That was a dispute below. And what I would say is that there are areas where different technologies can do the same things around the margin so that there may be some overlap here and there. There used to be an infrared protocol, and I haven't seen anything on the market like that for years now. Right. And I would say, Your Honor, Let me put it this way. If I didn't want to use Bluetooth, what could I use to accomplish the same thing? It depends on the precise need that you have. And we're not taking the position that this is the only possible technology that could send a signal from a cell phone to a headset. Now, we are taking the position that because there were lots of technologies out there, lots of proprietary technologies, that there was a need for a standard. And that's the whole point of having a standard. Let me ask you. As I understand it, a lot of the firms that join this Bluetooth special interest group and promote Bluetooth compete with each other. Is that right? That's correct, Your Honor. Virtually, as far as I can tell, virtually every major cellular phone manufacturer in the world is a member of the association and uses the Bluetooth language, the Bluetooth standard, is something that they incorporate into their products. So, I mean, we're talking about a standard that has been widely adopted. Tell me about whether there are analogies. I was thinking about this, and I was thinking if a computer has a sticker on it that says, Intel inside or Windows compliant, then it's promoting basically a product from Intel or Microsoft, and that's it. On the other hand, if it has a two-pronged plug with one prong a little fatter than the other, all it is is a standard that fits into any American socket made in recent years. If it says 35 millimeter and it takes the film that's the correct precise size and has the perforations in the precise place, then all it's doing is complying with the standard that all the 35 millimeter film cameras use. I suppose the IRS position is that this is more like Intel inside, and your position is that it's more like the 35 millimeter film. That's precisely, I think, the nub of the dispute, Your Honor. Help me with figuring out why it's more like that. I guess the argument against is that you sell for a lot of money the right to put the Bluetooth compliant sticker on the product. Well, let me handle that question in two parts. First of all, the association's activities are not like Intel inside because in the case of Intel inside, there's actually a chip, a microchip manufactured by the Intel company and sold to Dell or Apple or what have you, and it's actually put in the computer, and the same thing with Microsoft. Microsoft actually sells them the software that's installed as the operating system, for example, in the computer. Here, we're much more like the outlet. The outlet, I can see that up to where I get to the sticker. The thing is, the only thing that I see on the plug, and I don't see it on all of them, is a UL, Underwriters Laboratory, sticker, and that doesn't exactly say it complies with the standard. It says that it complies with reasonable electronic safety requirements. Your Honor, the difficulty here is that the standard here, the technology specification, is very complicated. So it's not enough to say to the consumer that this- Look, we're all computer users here, I imagine. Tell me another product that has a sticker like this where it's a business lead. Sure, I can tell you three. I mean, you've already mentioned one. One was the Infrared Data Alliance, which is a not-for-profit business league and was properly granted a Section 501c6 tax-exempt status. Oh, did it? And that was the protocol for when your computer talks to your printer through the infrared, like the HP printers used to have? That's correct. And it was a group of companies that got together to form a standard that was widely adopted, and the IRS in that case said that this is something that improves business conditions for a lot of people. Okay, give me a second one. A second one is Wi-Fi. We've all seen the Wi-Fi stickers on Starbucks or on the computer itself, which says that this computer can do Wi-Fi. But what is Wi-Fi? It's an organization, though. It is a standard that is promoted by an association just like the association here. You have to go to an association that approves the standard you're using in order to put the Wi-Fi sticker on your Starbucks window? That's correct, Your Honor. And is that a 501c6? That is also a 501c6. In fact, the tax-exempt papers are in the record in this case for both the Wi-Fi lines and the IRDA, the Infrared Data Alliance. IRDA, that's the name. And what's the third one? The third one is something called Zigbee, which is used more in industry than it is in consumer products, but it's also a wireless form of communication. It is a standard that a group of companies got together. It's a voluntary consensus standard. The companies got together and they said, we're all going to agree that this is how this particular type of communication should be done from a technological perspective. And they promote that standard. They do certification testing of that standard. The companies that want to use the standard have to go through a certification process and pay. Tell me a little more about Wi-Fi, what the similarities and differences are. That's something we're all familiar with. We all notice the sticker and use our laptops there if we're traveling. Tell me a little more about what the similarities and differences are. Well, from a technical perspective, Wi-Fi is for something that's called a local area network. It's generally a fixed network. In other words, you have one sort of Wi-Fi signal coming from a point and you grab that signal from your computer and then you're able to use the Internet. It's a longer range signal than the Bluetooth signal is. I thought Bluetooth was just five or ten feet. I didn't know it was ten feet. Yeah, it's up to ten meters. But the associations, the technical standard is different. It allows you to perform different functions, but the association behind it is very, very similar. I thought Wi-Fi and Bluetooth were almost the same thing in terms of function, though they're different standards, except that one was for when your camera and printer or computer and printer were right next to each other or camera and computer or your cell phone earpiece and your cell phone, and that the other was more so that you could have your router upstairs and use your downstairs computer to access the Internet longer distance. I think that's right, Your Honor. I think you understand it from a technical point of view. I mean, there are some subtle differences. It's different standards. It's kind of like Morse code versus some competing code. I mean, they're similar from a technical point of view. I mean, similar that they both allow wireless communication, but there are differences technically. But in terms of the associations, which were both granted 501C6, or Wi-Fi was granted 501C6, Bluetooth was not, there's really no meaningful difference. And, in fact, their expert was not able to point to any meaningful difference. Are the financial statements of all four organizations somewhat similar or identical in the character of income received? Your Honor, I don't know that we have actual financial statements in the record for these other. We're comparing apples and oranges, right? Well, I don't think so, Your Honor. In terms of the type of activities and the types of revenue that comes in as a result of the certification process, we're comparing apples and apples. Now, I can't tell you that I know precisely what their financials are, but Wi-Fi and Zigbee and IRTA all said, look, we're like the association that was a subject of revenue ruling 70-187. Now, is this different than the Engineer's Club? Let's compare that one. Well, the Engineer's Club was essentially a lunch club for engineers, and the Engineer's Club did not do any sort of professional development programs. Those were hosted by other organizations and just occurred at the Engineer's Club, and all they did was essentially sell lunch to the engineers. That was a particular service to those individual members that did not benefit the industry as a whole. What we're talking about here is something like the revenue ruling 70-187, where the organization there conducted a program of testing and certification of products to establish acceptable standards within the industry. That's exactly what the association here does. But it also determines compliance, right? That's right. Testing and certification is compliance, and as a result of the association's activities in the revenue ruling, they would get essentially a seal of approval, which is essentially all that the Bluetooth mark is. It's a seal of approval that says this product complies with the standard. That's all it is. I'd like to reserve my remaining time for rebuttal, if I may. Twenty-one seconds. All right. Thank you, Your Honor. Rebuttal. We'll hear from the government. Good morning, Your Honors. My name is Bridget Rowan. I'm an attorney with the Department of Justice, and I represent the United States as the appellee in this case. May it please the Court, I'd like, if I may, to step back and look at what the district court did in this case, which is to examine the regulation issued under 501c6. We reviewed that de novo, correct? That's correct, Your Honor. Could you help me with what's bothering me most? I'll try. Why is this different from Wi-Fi? Your Honor, there – if you look at the application for – I'll answer that in two ways, Your Honor. If you look at the application for Wi-Fi that is in the record, there are certain significant differences. One of the points on which the district court decided this case is that Bluetooth is providing particular services for its individual members. It provides marketing, promotion, trademark protection, and so forth. Secondly, you cannot have Bluetooth unless you are a member of Bluetooth. And Wi-Fi didn't do the same thing? The way the Wi-Fi described itself in its application to the IRS, and that's all the IRS had to go on, its application and a follow-up letter. The way it described itself, it was going to hold seminars, it was going to provide information about a particular technology standard. Do they certify that something is Wi-Fi compliant and hand out the sticker or allow display of the sticker? I don't know that there's enough in the record to really answer that definitively, Your Honor. They talked in general terms about that being something they might do. As I remember, the type font is the same. It always looks like the same thing. It kind of looks like a sticker that's passed out or authorized. I think that Wi-Fi is a very interesting analogy. I think the second response to your question, Your Honor, and one is that it seems that to the extent that they are not distinguishable, that they would be identical in every respect in the way in which they conduct business, then they probably should not have received an exemption as a 501. So you're saying the answer is not that Bluetooth should be treated like Wi-Fi in the sense that Bluetooth should get it, but Bluetooth should be treated like Wi-Fi in the sense that Wi-Fi should lose it? That's precisely what I'm saying, Your Honor. And I think depending on the outcome of this case. Now, why should it lose it? It seems to me that the you were finishing a sentence. I was about to say depending on the outcome of this case, I think the IRS tax exemptions are not written in stone, and the IRS can revoke a tax exemption when more information comes to light. So Wi-Fi is in peril? Is that what you're saying? Well, I don't, I certainly don't want to get into anything like that, Your Honor, other than to say as a broad statement that I think that depending on the outcome of this case, the IRS would take a very hard look at those three or four organizations that are mentioned by the taxpayer and that are in the record, because if they are doing what Bluetooth is doing, they should not be, that is not a tax exempt organization. Okay. You're just saying several reasons why you think Wi-Fi should lose its exemption. Well, I don't want to. Let me move on to the next question I had. I was reading this exemption and trying to figure out why Congress would do that, other than really good lobbyists or some congressmen who like something like the National Football League. The Business League exemption. It's a curious exemption. There's some kind of public good associated with it. Yes. For example, Chambers of Commerce promote commerce in a town, so the town is more prosperous. And it struck me that standard setting in electronics is probably a terrific example of promoting the public good. It's really nice to be able to buy a cell phone and not be locked into that particular manufacturer's earpiece, be able to buy another manufacturer's earpiece. It's nice to buy a printer and not be locked into that particular manufacturer's laptop. It's the sort of promoting of a standard that promotes general prosperity the same way Chambers of Commerce do. So it seems like a really good fit in terms of the purpose of the Business League exemption. You must have some different notion of what the purpose is. Tell me what it is. Yes, Your Honor. I do have a different notion. And the regulation and the Engineers Club decision and other decisions of this court explain that the idea of the Business League is a sort of, if you will, disinterested organization that promotes across the boards either, as in the American Plywood case, a particular position. That's what I'm thinking. Promotes the general prosperity as opposed to the interests of an individual firm. Right, exactly. Like a Chamber of Commerce would, oh, fix up Main Street and so forth. And so that benefits everybody who is on Main Street. So is there a particular firm that benefits through this SIG? Well, the firms that benefit are the members, Your Honor, because they're the only people who can label their product as Bluetooth compliant. And that's the reason why under the, I think it's number five of the engineers outlined, the different factors. But they're all competitors, and anyone can make a product and join up. Yes, Your Honor. What happened was a consortium of five competitors led by Ericsson, which controlled the tech, which had developed the technology. And we take issue with a description of it as a standard, but I think that's sort of a nomenclature thing. It's a feature. It's a technological feature. It's a product. It's incorporated into a variety of different electronic devices. It's nice that it's a standard, but I mean, it's not. It's more like Morse code, isn't it? Everybody agrees that da-da-da is S, and I think it was da-da is A, but I'm remembering from voiceouts. This is more complicated than that, Your Honor, because these specifications or this technology is constantly evolving, and they're constantly expanding the applications and so forth. But you cannot use this Bluetooth thing apart from signing up as a member with Bluetooth. It's not generally available to any manufacturer who wants to put this kind of technology into its product. And, yes, it's nice that this has become the dominant kind of wireless communication technology in the way that VHS beat out beta. I mean, it's better to have one, you know, it's probably for the benefit of the consumers to have one that's a predominant technology. But even counsel for the taxpayer conceded that this is not the only possible technology that could do this function. There are competitors, but Bluetooth has very successfully positioned its feature and its product as the dominant one in the marketplace, and that's what everybody looks for and everybody wants. Well, what about the analogy to plywood? Should we look at plywood as having a competitor in the board material, gypsum board, for example? That would be its competitor, yes, Your Honor. I think the point about plywood, well, there's several points about plywood. One is that it's promotional and testing. Isn't that what's going on here? Well, the promotional and testing aspects of American plywood were incidental, quite incidental, and that's the linchpin of that decision to its broader purpose of just promoting plywood in general. Well, why can't you be promoting Bluetooth in general? Because Bluetooth is not an industry. It's one of the many possible or one of several possible technologies that would do the same thing. In American plywood, the activities of the Plywood Association, which were quite a bit broader than just the testing and so forth and so on, benefited everybody who sold plywood, whether they were members of the association or not. Plywood is great compared to gypsum board. Here, what Bluetooth is marketing is the Bluetooth function, and so you have to pay them to incorporate it into your product, and other possible technologies that could have done the same thing, it's a competitive advantage that they get to say about their products that this is a Bluetooth-enabled device. Unless there's something in the code or the regs that limits business leagues to a single industry. I don't understand your argument. That is part of the limitation in the regulation, Your Honor. It has to be efforts on behalf of a line or industry as opposed to a particular kind of product or particular members, I think. Let me, if I may. Well, is this in 501C6-1? It's 1.501C6-1, the treasury regulation. Yeah. Okay, we're looking at it. Its activities should be directed to the improvement of business conditions of one or more lines of business as opposed to distinguish from the performance of particular service for individual persons or corporations. Is that the language you're depending on? Yes, Your Honor, in the case law that has interpreted those regulations. You know, I have trouble seeing why that helps you. And then I look at 7187 where it says an organization that provides seals of acceptance fits within the C6. I must be missing something. That's an organization that was formed to conduct a program of testing and certification to establish standards within an industry as a whole. So that would be the plywood industry. This industry of wireless communications is broader than just Bluetooth. So Bluetooth is … In electronics, you don't know what the industry is from one month to the next. I mean, cameras are mechanical devices with lenses, and then all of a sudden they're computers. It's a good point, Your Honor. I mean, but this is a particular kind of feature that has been created. I mean, if it were just Ericsson doing this, as was originally the case … Just Ericsson doing it, it wouldn't get the exemption. Right. It would just be Ericsson promoting itself. What interests me here is that it looks as though it really is kind of an electronic chamber of commerce or underwriters' labs trying to promote something that makes all the products more useful to consumers so that they'll buy more of them. But what if, as the district court noted, Your Honor, and quite correctly, what if you wanted to opt for one of the other alternatives to Bluetooth? Bluetooth is focused on … Go ahead, if that's useful to you. Right. You might want to do that if you want to avoid pirating or you want to avoid intrusion. You might want to get yourself a weird standard. So Bluetooth is … Consider it to be an old TRS-80 so nobody else can work it and your material is secure. But Bluetooth is working to the advantage of, to the competitive benefit of those members, of those manufacturers that opt to use its technology and pay for the … Why is that any different than American Plywood Association? Pardon me, Your Honor? Why is that any different than the American Plywood Association case? Because beyond American Plywood Association, American Plywood Association not only was running this testing and certification business, it had much broader sort of civic … If you examine the case, Your Honor, it had a long history before it started in on this certification. So this is a new organization. You can't rest on that point. I guess what I would say is, Your Honor, there's a plywood industry apart from American Plywood. And as a plywood manufacturer, I wouldn't have to join American Plywood to get the benefits of their touting the benefits of plywood as a building material. I think you have to be a member to use their grading seal. That's correct, Your Honor, and that was an error in the brief. I was confusing it with the revenue ruling, which has been cited, which followed American Plywood, and it was sort of based on the facts of American Plywood. You would need to be a member to use their grading system, but you would not need to be a member of American Plywood to derive benefits from their overall advertising. Their advertising, for example, is very general. It didn't mention specific producers or manufacturers, whereas here, for example, the producers have their logos on the Bluetooth website. Those are the five major … Because the Bluetooth technology is not a broad industry like the plywood industry. Well, it's a small but, let's say, growing industry, and someday it may very well be a very broad industry. Is that the test? I would say that they are analogous to a situation like Microsoft, where you have a product, it's become dominant in the field, you have to pay for the privilege of using it, and then you get to mark your product. You're talking about the OS, the operating system that Microsoft … Right. Windows, for example, all right. Which is put in many different kinds of computers from a variety of manufacturers. Maybe I'm misunderstanding it, but I thought this was more like ASCII or, in an earlier day, Morse code than like Windows. Not an operating system, but a protocol. And it seems like a sticker would be more like, this device understands Morse code. Your Honor, again, I would say it's more complicated than that, and I think taxpayers … Well, I realize that the transmission is more complicated. Back in the day with computers, before they were as complicated as they are now, I used to look for ASCII compliance in printers so that the programs I had written myself to transmit a particular ASCII character would still work in the new printer. And I thought this was like that. Certain electronic impulses over the air will be understood to mean a certain thing by this device, whether it's one of the car radios in a new car or the earphone or the camera or whatever. My understanding is, Your Honor, no, that it is not something like that. It's not an unwavering set of frequencies, let's say. It is a set of technical specifications using that as a starting point, and it is a thing, a kind of technology that is constantly evolving and expanding and reaching out to new products. It's not the only kind of program that could do that, perform that function. There are others who are competitors with Bluetooth or could have been, but this is not an across-the-boards thing like plywood, although that's what the taxpayer can pay. Thank you, Counsel. Your time has expired. Thank you, Your Honor. Mr. Marshall, help us on this industry point. You heard Counsel's argument that there really isn't any industry here in the sense that there was the plywood industry. What's your response to that? Your Honor, I would disagree with that. We're talking about an ingredient technology or a language that can be used in multiple industries, and the regulation, in fact, reflects the fact that it's one or more lines of businesses, so it can be multiple industries. We're talking about the cell phone industry. We're talking about the computer industry. The Bluetooth standard for communication between two devices is now starting to be incorporated into the medical device industry so that a heart rate monitor can communicate wirelessly to the nursing station down the hall. There are many, many industries in which this standard is benefiting those industries, and it doesn't have to benefit every single company. It benefits the industry as a whole because it makes available a standard for the entire industry. So the industry is the language, the protocol? Is that what you're saying essentially? No, I wouldn't phrase it that way. I think that this is a very difficult issue in terms of how you define an industry, and we're out on the cutting edge here. I mean, technology is changing and it's evolving. We're stuck with a treasury regulation that says it's the activities directed at the improvement of business conditions of one or more lines of business as distinguished from the performance of particular services for individual persons. That's the precise language that the government is relying on here. I agree with that, and, Your Honor, I guess I have a simple way of thinking about it. I think of industries as companies that sell products, and so I think of the cell phone industry, for example, and I think that this wireless standard improves the business conditions of that industry. Can you talk a little more technically about how it works? I made this comparison to Morse code or ASCII, and the lawyer for the government said, no, no, no, that's not right. But I don't exactly understand why that's not right actually. I mean, it could sound really new, but it can also be like we speak Urdu here. Right. Your Honor, I think your comparison, your analogy is right. It, of course, is more complicated than Morse code, but it's a sound analogy. It's a radio frequency communication in the public industrial spectrum. It uses something called frequency hopping so that the devices will hop from frequency to frequency, and I think that's done, although I'm not a technical expert to reduce interference problems, and it allows devices to come into the network and come out of the network as they are picked up. And the sender goes from, oh, whatever the Bluetooth equivalent is of 88.9 to 90.1 on your FM dial, and the Bluetooth receiver knows that it ought to jump from 88.9 to 91.1 after a certain number of beeps, something like that? Your Honor, I think that's a nice description of it. It's similar to that. It's more complicated. It involves packet switching, so the data is sort of encapsulated in packets. That just lets you send faster. Exactly. But I think that the packets can, you know, you may fire one packet off at one frequency and fire another packet off at another frequency, and there's information that goes that tells the receiver which frequency the next packet is coming at, for example. Counsel, we've allowed both sides to go over time, and your time has expired. Okay. Thank you very much. Thank you, Your Honor. The case just argued will be submitted for decision, and the Court will adjourn.
judges: Beezer, O'scannlain, Kleinfeld